STATE OF NEBRASKA, APPELLEE, V. JOSEPH B. EGGERS,
APPELLANT.
374 N.W.2d 36

Filed September 20, 1985.   No. 85-089.

Kent E. Florom, Lincoln County Public Defender, for appellant.

Robert M. Spire, Attorney General, and Bernard L. Packett, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

KRIVOSHA, C.J.

Following a trial to a jury, Joseph B. Eggers was found guilty of murder in the second degree in violation of Neb. Rev. Stat. § 28-304 (Reissue 1979). He now appeals from the judgment entered pursuant to the jury verdict. Eggers assigns as his single error that there was insufficient evidence to sustain his conviction. We have reviewed the record and believe that the assignment is without merit. For that reason it is overruled and the judgment affirmed.

The record discloses that on July 14, 1984, at approximately 4:44 p.m., the North Platte Fire Department rescue unit was called to a North Platte home on the report of a baby drowning in a bathtub. Upon arrival the rescue unit found the appellant

Eggers giving mouth-to-mouth resuscitation to the victim, a 3-year-old child. Further efforts by the rescue unit to revive the child were unsuccessful, and after 15 minutes efforts were ceased.

An autopsy was performed on the body of the child. Results of the autopsy disclosed multiple bruises on the face, upper shoulders, thorax, abdomen, and extremities, and a few bruises on the back and buttocks. The report further disclosed severe bruising on the right side of the head, including soft tissue hemorrhage and bruising which had been caused by some form of blunt trauma. An exposure of the brain indicated an area of subdural hemorrhage beneath the membrane of the skull. There were also bruises on the forehead and chin, and abrasions on the nose. The pathologist testified that the bruises on the child's body were deep bruises which were the product of a significant amount of force. The nose abrasion indicated contact with a fairly blunt surface, such as a wall. As a result of the autopsy, the pathologist concluded that death was the result of injury to the brain caused by the head being accelerated for some distance and then stopped by something stationary, such as a floor or a wall.

The State further produced the child's mother, who testified that she and Eggers had been taking amphetamines (speed) for several days prior to July 14, 1984. The mother testified that on July 14, the day the child died, she had twice gotten the child out from underneath a bed and had spanked her for crawling underneath it. She further testified that the second time the child crawled under the bed, she pulled it out from the wall to get the child and the bedframe cracked but did not collapse or fall on the child. When the child, for a third time, crawled under the bed, the mother told Eggers where the child was. According to the mother, Eggers got up from the couch in the living room, went to the bedroom, and pulled the child out from under the bed by her feet and ankles. In a rough manner he then took the child through the living room and to the dining room, where he made her stand in the corner. Still affected by the drugs, the mother lay down on a couch in the living room, where she heard Eggers spanking the child. She testified further that she heard some banging noises which she thought sounded like Eggers

trying to put the child in a closet. At the time the mother heard the banging sounds, she also heard Eggers saying, "Get in there." A short time later she sat up and looked to see where Eggers was. She observed Eggers standing in the dining room with a glass of milk. She fell back asleep to the sound of the child sobbing and sniffling in the dining room. A later examination of the dining room disclosed three oily marks on the wall at approximately the child's head level, indicating that something had been flailed against the wall.

Sometime later the mother was awakened by the sound of persons pounding on the door or window. She awoke, let three friends into the residence, and returned to the child's room, where she lay down on the bed. She was again awakened by one of the guests, and together they all went into the living room. They heard the sound of running water in the bathroom, a tapping sound, and a sound like a toilet seat being put down. Approximately 10 to 15 minutes later, Eggers came out of the bathroom with no shirt on and with wet hair. Two of the guests went into the bathroom after Eggers came out and saw the child in the bathtub. It was then that the emergency personnel were called.

The record discloses that Eggers related a number of different versions of what happened on July 14, 1984. He now argues that the version which he related after the autopsy results were made known was the correct version and should be accepted. According to Eggers' last version of what happened on July 14, 1984, he was lying on the couch in the living room. The child's mother went into the child's room and screamed at her to "get out from underneath that bed." Eggers then heard the bed sliding across the floor and a cracking sound, which was followed by four thuds. According to Eggers, these thuds sounded like something being slammed against the floor. Eggers testified that he heard the mother scream at the child, "You spoiled, rotten little brat, I wish you weren't around anymore." Eggers then went into the bedroom and found the child lying between the bed and the wall with her head and part of her chest under the bed. He pulled the child out from under the bed by her ankles and noticed that she was not moving, nor could she stand up. Eggers claims he then marched the child

into the dining room, where he let go of her and she fell. He then picked her up and propped her in the corner. Within a couple of minutes she fell out of the corner and it was at that time that the guests arrived. Eggers claimed that he then carried the child into the bathroom, where he continued to try to give her CPR. He maintains that he put the child into the bathtub with water in it because he was scared she was dead.

Eggers argues that the motion to dismiss should have been sustained because there is no direct evidence of his having inflicted on the child the physical injury which caused her death and that, therefore, the conviction is based upon speculation and suspicion. Moreover, he argues that his version of the facts is more credible than the version presented by the State through the mother.

It has long been the rule in this jurisdiction that direct evidence of a crime is not essential for a conviction and that one may be convicted on the basis of circumstantial evidence if, taken as a whole, the evidence establishes guilt beyond a reasonable doubt. *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981). See, also, *State v. Evans*, 215 Neb. 433, 338 N.W.2d 788 (1983); *State v. Trimble, ante* p. 639, 371 N.W.2d 302 (1985). Moreover, since *State v. Buchanan, supra*, we have held that in order to convict one on the basis of circumstantial evidence, the State is not required to disprove every hypothesis but that of guilt. There is no question that if the jury believed the evidence presented by the State, it was sufficient to establish guilt beyond a reasonable doubt.

Eggers' real argument is that his evidence should have been believed and the evidence presented by the State, through the mother, disbelieved. That is not a matter for this court to determine. It is not for this court to accept one version of the case over another; that was for the jury. In determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the trier of fact, and the verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. See *State v. Evans, supra*. The evidence as presented

by the State was sufficient to establish Eggers' guilt. The evidence showed that the child died as the result of severe blows to the head. The mother's testimony placed Eggers in the dining room with the child when "banging" noises were heard. There was also evidence presented of marks on the walls in the corner of the dining room which indicated that something had been flailed against the walls. By his own admission Eggers placed the child in a bathtub of water because he thought she was dead and was attempting to make it look as though she had drowned. In addition, Eggers admitted at trial that he did not relate to anyone the story of hearing four "thuds" in the bedroom until after the autopsy results, indicating the child died from severe blows to the head, were made known to him. Admittedly, the evidence was in conflict. This conflict was resolved by the jury against Eggers, and the record supports the jury's action in that regard. The judgment of the district court is affirmed.

AFFIRMED.